SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
JENNIFER R. SCULLION
(*pro hac vice* admission to be requested)
550 Broad Street, Suite 920
Newark, NJ  07102
Telephone:  973/639-9100
973/639-9393 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA              BOIES, SCHILLER & FLEXNER LLP
ALEXANDRA S. BERNAY          DAMIEN J. MARSHALL
ARTHUR L. SHINGLER III       DUANE L. LOFT
CARMEN A. MEDICI             MATTHEW S. TRIPOLITSIOTIS
655 West Broadway, Suite 1900   575 Lexington Avenue, 7th Floor
San Diego, CA  92101          New York, NY  10022
Telephone: 619/231-1058       Telephone:  212/446-2300
619/231-7423 (fax)            212/446-2350 (fax)

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEW JERSEY

| | |
|---|---|
| NECA-IBEW WELFARE TRUST FUND, Individually and on Behalf of All Others Similarly Situated, ) ) ) | No. |
| Plaintiff, ) ) | COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE CLAYTON ANTITRUST ACT |
| vs. ) ) | |
| TELIGENT, INC., PERRIGO COMPANY PLC, TARO PHARMACEUTICAL INDUSTRIES LTD. and TARO PHARMACEUTICALS USA, INC., ) ) ) ) ) ) | |
| Defendants. ) ) | DEMAND FOR JURY TRIAL |

Plaintiff NECA-IBEW Welfare Trust Fund ("plaintiff"), whose principal place of business is located at 2120 Hubbard Drive, Decatur, Illinois 62526, individually and on behalf of a class of all those similarly situated, brings this action for treble damages and injunctive relief against Teligent, Inc. ("Teligent"), Perrigo Company plc ("Perrigo"), Taro Pharmaceutical Industries Ltd. ("Taro Ltd.") and Taro Pharmaceuticals USA, Inc. ("Taro Inc.") (collectively, "defendants"), for violations of the Sherman Antitrust Act ("Sherman Act"), the Clayton Antitrust Act ("Clayton Act") and the laws of the several states identified herein. Based on counsel's investigation, research and review of publicly available documents, on plaintiff's personal knowledge, and upon information and belief, plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      Generic drugs are a key component of the healthcare system, and nearly 8 in 10 prescriptions filled in the United States are for generic drugs.[1] Entry of generics into the market is intended to benefit consumers and their overall health by increasing competition and decreasing prices for the benefit of consumers and the nation's health care system. Indeed, competitive generic products are essential to delivering adequate and affordable healthcare. In recent years, however, the prices of certain commonly prescribed generic drugs have skyrocketed. And normal market forces cannot explain these dizzying hikes. Instead, manufacturers have abused their oligopolistic position, acquired through a series of acquisitions which reduced the number of market participants, to increase prices far beyond what they would otherwise be in a

---

[1]      *See*                    http://www.fda.gov/Drugs/ResourcesForYou/Consumers/ BuyingUsingMedicineSafely/UnderstandingGenericDrugs/ucm167991.htm    (last accessed Dec. 13, 2016).

competitive market.   Generic econazole nitrate in its topical cream form ("Econazole")[2] – a potent topical antifungal used for the treatment of a variety of severe inflammatory skin infections (including, e.g., tinea, pityriasis versicolor, tinea pedis, dermatophysis and eczema marginatum) and one of the most prescribed antifungal dermatological drugs in the United States – experienced a dramatic price increase in mid-2014.  Beginning in late July 2014, immediately after attending a June 2014 generic pharmaceutical manufacturer meeting in Bethesda, Maryland, defendants collectively and dramatically inflated their generic Econazole prices. Defendants continued these coordinated price increases through at least early December 2014.  In that timeframe, average Econazole prices increased nearly 539% and have since been maintained at those supracompetitive levels.[3]   Defendants increased their Econazole prices in lockstep, with defendants all raising their respective Econazole Wholesale Acquisition Cost ("WAC") prices to virtually identical levels within roughly four months:

---

[2]    As used herein, "econazole nitrate" refers to the drug generally, regardless of form. "Econazole" (with an upper case "E") refers specifically to the drug's topical cream form.

[3]    Unless otherwise indicated:  (i) sales data is based on the Actual Acquisition Cost, which is the dollar amount retail brick-and-mortar and mail-order pharmacies pay to wholesalers for the given products, (ii) quantity data is based on the number of units in the total prescription dispensed for the associated products, and (iii) pricing data is the calculated per-unit price for the associated products.



2.     Such conduct has been the target of governmental investigations into anticompetitive generic drug pricing.  On September 8, 2016, Taro Inc. – who, with its co-conspirators here, manufactures and sells Econazole – received a grand jury subpoena from the U.S. Department of Justice ("DOJ") Antitrust Division.  According to a Taro Ltd. filing with the U.S. Securities and Exchange Commission ("SEC"), the DOJ is investigating Taro Inc.'s generic drug pricing, and specifically seeks documents and other materials relating to "generic pharmaceutical products and pricing" and company "communications with competitors . . . regarding the sale of generic pharmaceutical products."  On November 3, 2016, it was reported that the DOJ expects to file charges arising from its investigation by the end of 2016.  In the case of Econazole, Taro Ltd. and Taro Inc. (together "Taro") conspired with defendants Teligent and Perrigo, Taro's principal competitors.  These competitors all attended the June 2014 generic manufacturer meetings that immediately preceded the coordinated price increases.

3.     There is no reasonable justification for defendants' abrupt and uniform increase in prices. Rather, as demonstrated more fully herein, the price increases were the result of a continuing agreement in restraint of trade to raise and fix the price of generic Econazole. Accordingly, plaintiff NECA-IBEW Welfare Trust Fund, individually and on behalf of a class of those similarly situated, seeks injunctive relief, damages and all other appropriate relief for defendants' wrongdoing.

## JURISDICTION AND VENUE

4.     Plaintiff's claim for injuries sustained by reason of defendants' violations of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, are brought pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and the costs of this suit, including reasonable attorneys' fees.

5.     This action is also instituted under the antitrust, consumer protection and common laws of various states for damages and equitable relief, as described below.

6.     This Court has original federal question jurisdiction over the Sherman Act claims asserted in this Court pursuant to 28 U.S.C. §§1331 and 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367, including because those claims arise from a common set of operative facts and form part of the same case or controversy as the federal claims.

7.     Venue is proper in this judicial district pursuant to §§4(a) and 12 of the Clayton Act, 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period (July 25, 2014 through the present) one or more of the defendants resided, transacted business, was found, or had agents in this District, and

a substantial part of the events giving rise to plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.  Venue is also proper in this District because acts in furtherance of the alleged conspiracy took place here, where defendant Teligent's headquarters are located.

8.     Venue is also proper because each of the defendants operates and transacts business within the District, each of the defendants has substantial contacts with this District, and each of the defendants engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## THE PARTIES

9.     Plaintiff NECA-IBEW Welfare Trust Fund ("NECA-IBEW") is an employee health and welfare benefit plan with its principal place of business at 2120 Hubbard Avenue, Decatur, Illinois 62526.   Plaintiff NECA-IBEW indirectly purchased, paid and/or provided reimbursement for generic Econazole products, other than for resale, at supracompetitive prices in multiple states across the United States during the Class Period, and was thereby injured.

10.     Defendant Teligent is a Delaware corporation with its principal place of business in Buena, New Jersey.  Teligent holds itself out as a specialty generic pharmaceutical company engaged in the development, manufacture and marketing of generic topical and branded generic injectable pharmaceuticals.  Teligent also has its manufacturing facilities in Buena, New Jersey.  Teligent markets and sells generic

Econazole throughout the United States.  Prior to October 2015, Teligent operated under the name IGI Laboratories, Inc. ("IGI Labs").

11.    Defendant Perrigo, an international consumer healthcare and pharmaceutical company in Dublin, Ireland, develops, manufactures and markets a portfolio of generic and specialty pharmaceutical prescription drugs, including Econazole, throughout the United States.  Perrigo's U.S. headquarters are located in Allegan, Michigan.

12.    Defendant Taro Ltd. is an Israeli company with its principal place of business in Haifa Bay, Israel.  Taro Ltd. develops, manufactures and markets prescription drugs, including generic Econazole, throughout the United States.  Taro Ltd. purports to be a multinational, science-based pharmaceutical company that develops, manufactures and markets prescription and over-the-counter pharmaceutical products mainly in the United States, Canada and Israel.  The company's claimed focus includes semi-solids formulations, such as creams and ointments, and other dosage forms such as liquids, capsules and tablets, in the dermatological and topical, cardiovascular, neuropsychiatric and anti-inflammatory therapeutic categories.  Taro Ltd. operates in the United States principally through its subsidiary defendant Taro Inc.

13.    Defendant Taro Inc. is a New York corporation with its principal place of business in Hawthorne, New York.  Taro Ltd. operates in the United States through its wholly-owned subsidiary Taro Inc., which markets and distributes Taro proprietary and generic products, including the marketing and sale of generic Econazole throughout the United States.

14.     All acts alleged in this complaint to have been done by defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of defendants' business affairs.

**Co-Conspirators**

15.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

16.     At all relevant times, each defendant was an agent of each of the remaining defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each defendant ratified and/or authorized the wrongful acts of each of the other defendants.  Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

17.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale and provision of Econazole transmitted interstate between and among the offices of defendants and their customers throughout the United States, its territories and the District of Columbia (the "United States").

18.     Throughout the Class Period, defendants transported substantial amounts of Econazole in a continuous and uninterrupted flow of interstate commerce throughout the United States.

19.     Throughout the Class Period, defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States.

## FACTUAL ALLEGATIONS

### Generic Drugs in the United States

20.     Generic drugs are a critical aspect of the nation's healthcare system, but that was not always the case.  In 1984, Congress enacted the Hatch-Waxman Act, which simplified the regulatory process of bringing generic branded drugs to the public in several ways.  First, it eliminated the requirement that generic companies file a complex New Drug Application ("NDA") in order to obtain U.S. Food and Drug Administration ("FDA") approval and a requirement regarding duplicative clinical trials that had been necessary for a generic drug to gain approval.  Instead, the Hatch-Waxman Act set up a system that required drug companies who wanted to bring a generic drug to market to file something called an Abbreviated New Drug Application ("ANDA") and allowed generic drug makers to rely on the safety and efficacy data provided by the original NDA holder.  Additionally, the Hatch-Waxman Act made other changes related to the time period during which branded drugs would enjoy a period of generic marketing exclusivity.

21.     Generic drugs are exact substitutes for brand name drugs that have met standards for bioequivalence and pharmaceutical equivalence set by the FDA.  To be

approved by the FDA through an ANDA, a generic drug product must contain the same active ingredient(s), in the same dosage form and in the same strength, and be bioequivalent to the reference listed drug (*i.e.*, the original brand name version of the drug approved by FDA through an NDA). Under the FDA rules, products that are classified as equivalent can be substituted with the full expectation that the substituted product will have the same clinical effect and safety profile as the prescribed product.

22.   Once a brand name manufacturer receives NDA approval, it may list its patents in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations. The FDA relies on the brand name manufacturer for information concerning the validity of the patents and applicability of the patents to the brand name drug.

23.   To obtain FDA approval of an ANDA, a generic manufacturer must certify that the generic drug will not infringe the patent for the drug of which it is the generic (called a "Paragraph IV Certification"). A Paragraph IV Certification states "that such patent [for the brand name drug] is invalid or will not be infringed by the [generic manufacturer's proposed product]."

24.   As an incentive to spur generic companies to provide alternatives to branded drugs, the first generic manufacturer to file a substantially complete ANDA containing a Paragraph IV Certification is allowed to market its generic drug free from competing generic manufacturers for a set period. Often the first generic in the market comes in at a price well below the branded drug and quickly takes a large market share from the branded drug. As more generics enter the market, Stephen W. Schondelmeyer (BS Pharm, MA Pub. Adm., Pharm.D., Ph.D., PAPhA, Professor and

Head of the Department of Pharmaceutical Care and Health System, Century Mortar Club Endowed Chair in Pharmaceutical Management & Economics, University of Minnesota) explains, the prices of the generics "continue to fall compared to the brand price, and their combined share of the market for the molecule, relative to the brand name equivalent, usually continues to grow."[4]  Professor Schondelmeyer also states:

> The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.

25.     In his remarks to Congress in November 2014, Professor Schondelmeyer noted that price trends for generic drugs were rising, and rising at a rate far outstripping the rate of general inflation – a rate of 12.9% vs. 1.5%.  He also explained that "[t]he average annual retail price increase for brand name prescription drug products in 2013 (12.9 percent) was more than two times higher than the average annual brand name drug price increase in 2006 (5.7 percent)."

26.     The average price of Econazole sold by defendants saw a hike of 539% in four months in 2014.  Defendants' Econazole list prices (or Wholesale Acquisition Cost) likewise uniformly rose between 700% and 851%.  The price of Econazole continues to be inflated to this day.  Defendants' 2014 price hikes are illustrated below:

---

[4]     *See Why Are Some Generic Drugs Skyrocketing in Price?*:  Hearing before the S. Comm. on Health, Education, Labor and Pensions, 113th Cong. (Nov. 20, 2014) (Statement of Stephen W. Schondelmeyer).

**Defendants' Econazole List Prices**



27.    The Actual Acquisition Cost of Econazole, which is the dollar amount retail brick-and-mortar and mail-order pharmacies pay to wholesalers, reflects the same pattern:

**Retail Pharmacies' Econazole Purchase Prices**



**Econazole Nitrate**

28.     Econazole nitrate – which has been available on the generic market since 1999 – is a potent topical antifungal used for the treatment of a variety of inflammatory skin infections (including, *e.g.*, tinea, pityriasis versicolor, tinea pedis, dermatophysis and eczema marginatum) and is one of the most prescribed antifungal dermatological drugs in the United States.  The market for generic drugs such as econazole nitrate is mature.  Over a million Americans were prescribed the drug during the Class Period.  Annual Econazole sales for 2015 were $430 million; aggregate sales for 2011-2014 were $395 million.[5]

29.     At all relevant times, defendants dominated the Econazole market.  In 2014, Perrigo's Econazole sales exceeded $146.7 million.  Taro's Econazole sales for the same period exceeded $41.4 million, and Teligent's 2014 Econazole sales exceeded $14.49 million.  Based on these sales, defendants' Econazole sales make up roughly 94% of domestic econazole nitrate sales, and represent 97.3% of the generic Econazole market:

---

[5]    Based on 2015 sales figures, a small separate amount of econazole nitrate ($11 million) is sold as topical foam.  Defendants do not sell econazole nitrate in the topical foam form.



30.     Prior to June 2014, the average price for Econazole had remained stable at $0.79 per unit since at least as early as January 2011.  Then, following defendants' June 2014 meeting, the average price of Econazole rose abruptly during a subsequent four-month period:



**Defendants' Price Hikes Were Dramatic and Uniform**

31.     As illustrated above, the hike in defendants' Econazole prices was dramatic and uniform.  At or around mid-July 2014, defendants' manufacturer list prices for Econazole (per unit) were:

| Manufacturer | 7/18/2014 |
|---|---|
| Perrigo | $0.57 |
| Taro | $0.49 |
| Teligent | $0.59 |

32.     As the conspiracy unfolded over the next four months, defendants raised their Econazole list prices in coordination.  By early December 2014, defendants' inflation of their Econazole list prices was complete and in line:

| Manufacturer | 12/5/2014 |
|---|---|
| Perrigo | $4.59 |
| Taro | $4.72 |
| Teligent | $4.66 |

33.     Defendants' list price inflation had a direct impact on Econazole's Average Wholesale Price ("AWP"), which is the price at which pharmaceuticals are purchased at the wholesale level.  Indeed, the magnitude of defendants' price inflation is indisputable, as illustrated by the following Econazole AWP for each defendant on July 25, 2014 and December 5, 2014:

| Manufacturer | 7/25/2014 | 12/5/2014 |
|---|---|---|
| Perrigo | $0.82 | $5.49 |
| Taro | $0.68 | $5.38 |
| Teligent | $0.59 | $4.37 |

**No Commercial Justification for Price Hike**

34.     There were no reasonable justifications for this abrupt shift in pricing conduct.  One reason prices might rise could be a supply disruption or shortage, but there was no such disruption or shortage related to Econazole prior to, after or during mid-2014.  The FDA reported no Econazole drug shortages, there was no new patent or formulation, no labelling changes and, once in production, Econazole is not difficult to make.  Defendants have not provided any meaningful explanation for the coordinated price rise.  Indeed, there were no similar price hikes in other countries, including, for example, in the United Kingdom, Denmark or Norway.  Econazole prices have remained consistent in those countries as illustrated below:



**Governmental Investigations into Defendants' Activities**

35.     The hike in prices of generic drugs has resulted in government investigations, the results of which are unknown at this time.

36.     According to Taro Ltd.'s SEC Form 6-K, filed on September 9, 2016, Taro Inc., "as well as two senior officers in its commercial team, received grand jury

subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."

37.     That Taro received subpoenas from a federal grand jury seeking information about its generic prices and "communications with competitors" is significant, as the DOJ's Antitrust Division Manual cautions that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Antitrust Division Manual, at III-82, §F.1 (Apr. 2015).  The staff "should forward the grand jury request memorandum to the field office chief for review.  If approved by the chief, the grand jury request memorandum should be emailed to the [Antitrust Criminal Enforcement Division]." *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.*  Thus, the fact that Taro and its employees received federal grand jury subpoenas is a strong indicator that antitrust offenses have occurred.

38.    The issue of skyrocketing generic drug prices is one of national importance.  In addition to the DOJ subpoenas, Congress has taken an interest in the spiraling costs of generic drugs, holding hearings and calling for an investigation.  In October 2014, Senator Bernie Sanders (I-Vt.) and U.S. Representative Elijah E. Cummings (D-Md.) launched an investigation into soaring generic drug prices.

39.    According to a press release issued by Sanders and Cummings, at that time, they wrote letters to 14 pharmaceutical companies that stated "'[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses.'"  Cummings and Sanders cited a survey that found pharmacists across the country "'have seen huge upswings in generic drug prices that are hurting patients'" and having a "'very significant'" impact on pharmacists' ability to continue serving patients.  The study for the National Community Pharmacists Association also found some patients refused to fill needed prescriptions because of rising prices.[6]

40.    "'It is unacceptable that Americans pay, by far, the highest prices in the world for prescription drugs.  Generic drugs were meant to help make medications affordable for the millions of Americans who rely on prescriptions to manage their health needs.  We've got to get to the bottom of these enormous price increases,'" Sanders said.  *Id.*

41.    "'When you see how much the prices of these drugs have increased just over the past year, it's staggering, and we want to know why,'" said Cummings.  "'I

---

[6]    Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing (last accessed Dec. 13, 2016).

am very pleased that Chairman Sanders has joined me in this bicameral investigation because in some cases these outrageous price hikes are preventing patients from getting the drugs they need.'" *Id.*

42.     On November 3, 2016, it was reported by *Bloomberg* that "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion" and that the DOJ said that "the first charges could emerge by the end of the year."

**Trade Associations Facilitated Defendants' Scheme**

43.     The conspiracy related to Econazole was likely accomplished in part through the use of trade organizations.  According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by a prosecutor involved with the government's generic pricing investigation said the DOJ is looking closely "'at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers.'"   The investigative subpoena issued to Taro focuses on "communications with competitors . . . regarding the sale of generic pharmaceutical products."

44.     The Generic Pharmaceutical Association ("GPhA") is the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry.  GPhA was founded in 2000, following the merger of three industry trade organizations: the Generic Pharmaceutical Industry

Association, the National Association of Pharmaceutical Manufacturers and the National Pharmaceutical Alliance.

45.    GPhA describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  With the consolidated GPhA, the industry now is afforded near limitless opportunities to collude under the guise of speaking with a stronger, unified voice before federal and state lawmakers, regulatory policymakers and international agencies.

46.    Defendants met together at GPhA meetings on June 3-4, 2014, and November 2-4, 2014, both times in Maryland.  As illustrated above, pricing data demonstrates that, shortly after these meetings, defendants dramatically and uniformly inflated the cost of generic Econazole.  There was no change in market conditions during this period to explain the uniform price hike – *i.e.*, no corresponding increase in raw material costs or in demand.  These uniform, dramatic price increases in a mature market are inconsistent with independent, competitive decision making, because each defendant failed to use the sudden, dramatic and unjustified increase in the price of the other's product as an opportunity to increase its own market share, despite having the financial, technical and manufacturing capacity to do so.

## THE GENERIC ECONAZOLE MARKET
## IS SUSCEPTIBLE TO ANTICOMPETITIVE CONDUCT

47.    Publicly available data on the generic Econazole market in the United States demonstrates its susceptibility to cartelization by the defendants.  Factors that make a market susceptible to collusion include: (1) a high degree of industry

concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (6) absence of a competitive fringe of sellers; and (7) inter-competitor contacts and communication. Each of those factors is present here.

**Market Concentration**

48.   A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.  In the U.S. generic Econazole market, the firms that currently control the vast majority of the market are the defendants.  As discussed above and illustrated below, defendants' 2014 annual sales of Econazole – collective sales of roughly $202.6 million – for example, make up roughly 94% of all annual Econazole sales and 97.3% of generic Econazole sales:



49.   Defendants' collective dominance is also compellingly illustrated by comparing the Herfindahl-Hirschman Index ("HHI") for Econazole and for Benzodiazepine, which is another generic drug that belongs to an entirely different Anatomical Therapeutic Chemical classification code.  HHI is a standard measure of

the size of firm concentration in relation to a given industry and an indicator of the amount of competition in that industry.  An HHI score of 0 indicates perfect competition whereas a score of 10,000 indicates a monopoly.  The DOJ classifies an industry as "concentrated" if the HHI exceeds 1,800 and considers markets in which the HHI is exceeds 2,500 to be "highly concentrated."[7]  As illustrated below, the HHI for Econazole on average since the beginning of 2012 shows a highly concentrated market.  The Benzodiazepine index was roughly half that of Econazole during the same timeframe and its price movements remained relatively stable:



**Barriers to Entry**

50.     Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

_____

[7]   *See* https://www.justice.gov/atr/herfindahl-hirschman-index (last accessed Dec. 13, 2016).

51.    Here, there are significant capital requirements, high manufacturing costs, and regulatory and intellectual property barriers to entry into the generic Econazole market.  ANDAs alone, which are necessary to bring a new generic drug to market, take an average of 36 months to be approved by the FDA.  This process can take even longer if the FDA requires Tier 1 and 2 amendments.

52.    In addition, defendants – a very limited number of participants – dominate the Econazole market, one also considered too small on a worldwide basis to entice most of the world's major pharmaceutical manufacturers to enter.

**Demand Elasticity**

53.    Elasticity of demand is defined as the relationship between a change in the quantity demanded for a product or service and a change in price for the same product.  More simply, it is a measure of the responsiveness of a change in price on the quantity demanded.  Demand is considered inelastic if an increase in price yields only a small decrease in quantity sold.

54.    Generic Econazole is an important and critical drug for over a million people who require it.  Patients consider it a necessity that must be purchased at whatever price the defendants offer it.  As such, demand for Econazole is inelastic.  Generic Econazole is an ideal product to fix the price of, as price increases result in significantly more revenue with little loss in sales volume.  Defendants were able to significantly increase Econazole prices with minimal effect on the quantity demanded.

55.    Econazole, for example, has an almost perfectly inelastic demand curve, as illustrated below.  Indeed, a 539% increase in price for Econazole results in only a 17% decrease in quantity demanded.  For Medical Care and Insurance, however, a

price increase of 125% would result in no more quantity being demanded.  Highly

inelastic demand facilitates defendants' cartel behavior, because defendants are able to

significantly raise Econazole prices with minimal effect on quantity demanded, but

receive a massive upside of hundreds of millions of dollars gained:



| Examples | Ed | % Change in Price | % Change in Qd | Elasticity |
|---|---|---|---|---|
| Econazole | -0.01 | 539% | -17% | Highly inelastic |
| Medical Care and Insurance | -0.80 | 125% | -100% | Relatively inelastic |
| Public Transportation | -3.50 | 29% | -100% | Highly elastic |

**Lack of Substitutes**

56.    While there are other topical drugs under the same code on the market

(Act and/or their Therapeutic Characteristics ("ATC") code D01AC (Antifungals for

Topical Use /Imaidozole and Triazole Derivatives)) there are significant barriers to

change.  Econazole is prescribed for a variety of specific health conditions, including tinea, pityriasis versicolor, tinea pedis, dermatophysis and eczema marginatum. Annually, close to a million Americans use Econazole because it is unique in its potency, formulation and effectiveness.

57.     A small but significant increase in the price of Econazole does not cause users to switch to other drugs.  Even a large increase in price, such as occurred here, did not cause most users to switch to another drug.  As clotrimazole, sertaconazole, oxiconazole and luliconazole, drugs that reside in the same ATC coding as Econazole and, as such, are similar in clinical effect, illustrate, despite the similarity in effect, the total quantity of Econazole after the price hike remains strong:



58.     Based on prescriptions filled nationally from January 2012 to mid-2015, Econazole remains the prescription of choice over these comparable drugs for doctors and consumers.  Even if there were a sea-change shift toward these comparables in prescriptions, defendants' scheme would not see any material change for a number of

reasons, including that co-pay tiering changes take significant time (up to a two-year lag), consumers have little incentive to change a repeat prescription since price shock is absorbed by insurers and Medicare, and there are explicit barriers forbidding Medicare to negotiate prices.

59.    Total sales for Econazole compared to those of clotrimazole between January 2012 and late 2015 likewise illustrate that Econazole's price hike resulted in significantly greater sales by defendants, while clotrimazole's sales saw no meaningful increase:



**High Degree of Interchangeability**

60.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively.  Generic drugs are by definition interchangeable.

61.     The generic econazole nitrate products made by the defendant manufacturers are chemically identical.  The FDA requires that products be coded "AB" if a study demonstrating bioequivalence is submitted.  The FDA lists econazole nitrate as an AB-rated generic drug.  This confirms that all manufactured versions of econazole nitrate are therapeutically equivalent to each other and pharmacists are able to substitute one manufacturer's version for another.  The following chart based on FDA ANDA application records for Econazole demonstrates this interchangeability:

| Drug Name | Active Ingredients | Strength | Form | Therapeutic Equivalent Code | Application Number | Company |
|---|---|---|---|---|---|---|
| Econazole Nitrate | Econazole Nitrate | 1% | Cream | AB1 | A076005 | Taro |
| Econazole Nitrate | Econazole Nitrate | 1% | Cream | AB1 | A076475 | Fougera |
| Econazole Nitrate | Econazole Nitrate | 1% | Cream | AB1 | A076479 | Perrigo |
| Econazole Nitrate | Econazole Nitrate | 1% | Cream | AB1 | A076574 | Teligent |

**Absence of Competitive Sellers**

62.     Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at lower, more competitive prices.  This reduces revenue and makes sustaining a conspiracy more difficult.  In the market for generic Econazole, there is no realistic threat that a fringe of competitive sellers will take market share from defendants.  The defendants in the market for generic Econazole have oligopolistic power over the market, which facilitates their ability to raise prices without losing market share to non-conspirators.  And, after the dramatic price increases, the data demonstrates no defendant is willing to meaningfully undercut prices to gain market share as would be expected in a competitive marketplace.

**Contacts and Communication Opportunities**

63.     In order to be successful, collusive agreements require a level of trust among the conspirators.   Collaboration fostered through industry associations facilitates relationships between individuals who would otherwise be predisposed to compete vigorously with each other.   Here, the defendants are members of or participants in GPhA, which describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[8]   Thus, representatives of the defendants have the opportunity to meet and conspire at functions of this group, as well as at industry meetings.   The grand jury subpoena to Taro Inc., requesting information about communications between the defendants here, lends further support to the conclusion that communications between competitors occurred with respect to the pricing of generic Econazole.

64.     In addition to their regular meetings at generic pharmaceutical industry events, defendants have access to and share significant and highly detailed market pricing and quantity information.   This information sharing provides opportunity to share information and facilitates pricing coordination, especially in a market with limited participants.   Federal DOJ and U.S. Federal Trade Commission ("FTC") antitrust guidelines acknowledge and are formed by the significance of this fact in the context of access to competitor information:

---

[8]     *See* http://www.gphaonline.org/about/membership (last accessed Dec. 13, 2016).

A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals. This is more likely to be the case if the terms offered to customers are relatively transparent. Price transparency can be greater for relatively homogeneous products. . . . Regular monitoring by suppliers of one another's prices or customers can indicate that the terms offered to customers are relatively transparent.

\*       \*       \*

The Agencies [*i.e.*, DOJ/FTC] regard coordinated interaction as more likely, the more the participants stand to gain from successful coordination. Coordination generally is more profitable, the lower is the market elasticity of demand.[9]

65.     Here, in the highly inelastic generic Econazole market, dominated by defendants, defendants were able to ensure the success of their scheme and police for any cheating because they actively share and have access to one another's prices, market share, quantities sold and other material market and sales data.

## DEFENDANTS' ANTITRUST VIOLATIONS

66.     During the Class Period, defendants engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic Econazole in the United States.

67.     In formulating and effectuating the contract, combination or conspiracy, the defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to artificially raise, fix, maintain and/or stabilize the price of generic Econazole sold in the United States.  These activities included the following:

---

[9]     U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* §7.2 (Aug. 19, 2010).

(a)     Defendants participated in meetings and/or conversations to discuss the price of generic Econazole in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Econazole sold in the United States;

(c)     Defendants agreed during those meetings and conversations to fix the prices of generic Econazole; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

68.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this complaint.

69.     During and throughout the period of the conspiracy alleged in this complaint, plaintiff and members of the Class purchased generic Econazole at inflated and supracompetitive prices.

70.     Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of §§1 and 3 of the Sherman Act (15 U.S.C. §§1 and 3) and the laws of various states.

71.     As a result of defendants' unlawful conduct, plaintiff and the other members of the Class (as defined below) have been injured in their business and property in that they have paid more for generic Econazole than they would have paid in a competitive market.

72.    The unlawful contract, combination or conspiracy has had the following effects, among others:

(a)    Price competition in the market for generic Econazole has been artificially restrained;

(b)    Prices for generic Econazole sold by defendants have been raised, fixed, maintained or stabilized at artificially high and non-competitive levels; and

(c)    Purchasers of generic Econazole have been deprived of the benefit of free and open competition in the market for generic Econazole.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to certify two classes, the first under federal antitrust laws and the second under the various state laws detailed below in Counts II, III and IV.

74.    The Nationwide Class is brought under Fed. R. Civ. P. 23(a) and (b)(2) and seeks equitable and injunctive relief.  The Nationwide Class is defined as follows:

> All persons and entities in the United States, as defined herein, who purchased, paid and/or provided reimbursement for some or all of the purchase price of defendants' generic Econazole from July 25, 2014 through the present.  This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic Econazole for purposes of resale or directly from defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of defendants' generic Econazole were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

75. Plaintiff also brings this action as a class action under Fed. R. Civ. P. 23(a) and (b)(3), seeking damages under the state antitrust, common law and consumer protection laws of the states listed below (the "Indirect Purchaser States"). This class is the Damages Class and is defined as follows:

> All persons and entities in the Indirect Purchaser States who purchased, paid and/or provided reimbursement for some or all of the purchase price of defendants' generic Econazole from July 25, 2014 through the present. This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic Econazole for purposes of resale or directly from defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of defendants' generic Econazole were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

76. The Nationwide Class and the Damages Class are referred to collectively herein as the "Class."

77. Due to the nature of the trade or the commerce involved, plaintiff does not know the exact number of Class members involved; however, plaintiff believes that Class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

78. Plaintiff is a member of the Class, plaintiff's claims are typical of the claims of the Class members, and plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and Class members purchased generic Econazole at artificially maintained supracompetitive prices established by the actions of

defendants in connection with the restraint of trade alleged herein.  Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

79.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex class action litigation.

80.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

81.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages and restitution.  Among the questions of law and fact common to the Class are:

(a)    Whether defendants and their co-conspirators colluded to fix, raise, maintain and/or stabilize the price of generic Econazole in the United States;

(b)    Whether defendants violated §1 of the Sherman Act;

(c)    Whether defendants violated §3 of the Sherman Act;

(d)    Whether defendants violated the laws of the Indirect Purchaser States;

(e)    The duration of the conspiracy alleged in this complaint;

(f)    The nature and character of the acts performed by defendants in furtherance of the conspiracy;

(g)    Whether, and to what extent, defendants were and continue to be unjustly enriched in connection with their violations of law;

(h)    Whether, and to what extent, the conduct of defendants caused injury to plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

(i)    Whether plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of §1 of the Sherman Act.

82.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this complaint.  This class action likely presents no difficulties in management that would preclude its maintenance as a class action.  Finally, the Class is readily ascertainable.

## COUNT I

### For Violation of §§1 and 3 of the Sherman Act
### on Behalf of Plaintiff and the Nationwide Class

83.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

84.    During the Class Period, defendants engaged in a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, by artificially reducing or eliminating competition in the market for generic Econazole and engaging in a conspiracy to

artificially fix, raise, maintain and/or stabilize the prices for generic Econazole in the United States.

85.     In particular, defendants have agreed, combined and conspired to raise, fix, maintain or stabilize the prices of generic Econazole in the United States.

86.     In formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which was to artificially fix, raise, maintain and/or stabilize the prices of generic Econazole in the United States.

87.     Defendants' combination or conspiracy consisted of a continuing agreement, understanding and concerted action among defendants.

88.     Defendants' conspiracy had the effect of artificially inflating the prices of generic Econazole in the United States.

89.     As a direct and proximate result of defendants' unlawful conduct, plaintiff and the other members of the Nationwide Class paid more for generic Econazole than they otherwise would have paid in the absence of defendants' unlawful conduct.

90.     By reason of defendants' unlawful conduct, plaintiff and members of the Nationwide Class have been deprived of free and open competition in the purchase of generic Econazole.

91.     As a direct and proximate result of defendants' conduct, plaintiff and members of the Nationwide Class have been injured and damaged in their business and property in an amount to be determined.

92.     These agreements constitute trade restraints made between direct competitors that are unlawful under all three applicable standards of review:  (1) the *per se* standard, which governs bid-rigging and the allocation of markets by horizontal agreement; (2) the "quick-look" standard, which governs apparently anticompetitive schemes with which the courts lack familiarity; and (3) the rule-of-reason standard (the "Rule of Reason"), which governs all other challenged restraints of trade. Plaintiff respectfully submits that the Court should apply well-recognized *per se* rules in order to condemn the challenged trade restraints, but in an abundance of caution pleads this claim in the alternative so that it is raised not only under the *per se* rules, but also under the "quick-look" standard and the Rule of Reason.

93.     Plaintiff and members of the Nationwide Class are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Violations of State Antitrust Statutes
### on Behalf of Plaintiff and the Damages Class

94.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

95.     During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Econazole in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

96.     The contract, combination or conspiracy consisted of an agreement among defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for generic Econazole and to allocate customers for generic Econazole in the United States.

97.     In formulating and effectuating this conspiracy, defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic Econazole at certain levels, and otherwise to fix, increase, inflate, maintain or stabilize effective prices paid by plaintiff and members of the Damages Class with respect to generic Econazole provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to and police the unlawful agreements they reached.

98.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain or stabilize prices of generic Econazole.

99.     Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

100.    Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. 10/3, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for generic Econazole was restrained, suppressed and eliminated throughout Illinois; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive artificially inflated prices for generic Econazole.  During the Class

Period, defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/3, *et seq*. Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/3, *et seq*.

101. Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic Econazole price competition was restrained, suppressed and eliminated throughout Wisconsin; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive artificially inflated prices for generic Econazole. During the Class Period, defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §133.01, *et seq*. Accordingly, plaintiff and members of the Damages Class seek all relief available under Wis. Stat. §133.01, *et seq*.

102.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of defendants' unlawful combination, contract, conspiracy and agreement.   Plaintiff and members of the Damages Class have paid more for generic Econazole than they otherwise would have paid in the absence of defendants' unlawful conduct.   This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes defendants' conduct unlawful.

103.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiff and the members of the Damages Class.

104.    Accordingly, plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT III

### Violations of State Consumer Protection Statutes
### on Behalf of Plaintiff and the Damages Class

105.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

106.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

107.    Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade

Practices Act, Fla. Stat. §501.201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed and eliminated throughout Florida; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive artificially inflated prices for generic Econazole. During the Class Period, defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201, *et seq.*, and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

108.   Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed or obtained in Illinois and took efforts to conceal their agreements from plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions,

of which plaintiff could not possibly have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases.  Defendants' public statements concerning the price of generic Econazole created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy.  Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.  The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of Illinois law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of Illinois consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed and eliminated throughout Illinois; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive artificially inflated prices for generic Econazole.  During the Class Period, defendants marketed, sold or distributed generic Econazole in Illinois, and defendants' illegal conduct substantially affected Illinois commerce and consumers.  During the Class Period, each of the defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Econazole in Illinois.  Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an

amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq*., and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

109.   Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of Ind. Code §24-5-0.5-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed or obtained in Indiana and took efforts to conceal their agreements from plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Econazole created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy. Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of Indiana law, which resulted in consumer injury and broad adverse impact

on the public at large and harmed the public interest of Indiana consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed and eliminated throughout Indiana; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Indiana; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive artificially inflated prices for generic Econazole. During the Class Period, defendants marketed, sold or distributed generic Econazole in Indiana, and defendants' illegal conduct substantially affected Indiana commerce and consumers. During the Class Period, each of the defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Econazole in Indiana. Defendants' conduct was deceptive and done as part of a scheme, artifice or device with intent to defraud or mislead, and is, therefore, incurable. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code §24-5-0.5-1, *et seq.*, and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

110. Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of Ky. Rev. Stat. §367.110, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by

affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed or obtained in Kentucky and took efforts to conceal their agreements from plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Econazole created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy. Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of Kentucky law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of Kentucky consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed and eliminated throughout Kentucky; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kentucky; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and

members of the Damages Class paid supracompetitive artificially inflated prices for generic Econazole.  During the Class Period, defendants marketed, sold or distributed generic Econazole in Kentucky, and defendants' illegal conduct substantially affected Kentucky commerce and consumers.  During the Class Period, each of the defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Econazole in Kentucky. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. §367.110, *et seq*., and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

111.   Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from plaintiff and members of the Damages Class.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which plaintiff could not possibly have been aware.

Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Econazole created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy. Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive artificially inflated prices for generic Econazole. During the Class Period, defendants marketed, sold or distributed generic Econazole in North Carolina, and defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Econazole in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their

injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq*., and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

112.   Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Stat. §56:8-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole was sold, distributed or obtained in New Jersey and took efforts to conceal their agreements from plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which plaintiff could not possibly have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Econazole created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy.  Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.  The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the

meaning of New Jersey law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New Jersey consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed and eliminated throughout New Jersey; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Jersey; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive artificially inflated prices for generic Econazole. During the Class Period, defendants marketed, sold or distributed generic Econazole in New Jersey, and defendants' illegal conduct substantially affected New Jersey commerce and consumers. During the Class Period, each of the defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Econazole in New Jersey. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. §56:8-1, *et seq*., and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

113.    Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of Wis. Stat. §100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing,

controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Econazole were sold, distributed or obtained in Wisconsin and took efforts to conceal their agreements from plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which plaintiff could not possibly have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Econazole created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by defendants' illegal conspiracy.  Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.  The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of Wisconsin law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of Wisconsin consumers in an honest marketplace in which economic activity is conducted in a competitive manner.  Defendants' unlawful conduct had the following effects: (1) generic Econazole price competition was restrained, suppressed and eliminated throughout Wisconsin; (2) generic Econazole prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and

members of the Damages Class paid supracompetitive artificially inflated prices for generic Econazole.  During the Class Period, defendants marketed, sold or distributed generic Econazole in Wisconsin, and defendants' illegal conduct substantially affected Wisconsin commerce and consumers.  During the Class Period, each of the defendants named herein, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Econazole in Wisconsin. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. §100.18, *et seq*., and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

## COUNT IV

### Unjust Enrichment
### on Behalf of Plaintiff and the Damages Class

114.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

115.   As a result of their unlawful conduct described above, defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices for, and unlawful profits on, generic Econazole.

116.   Defendants have benefited from their unlawful acts and it would be inequitable for defendants to be permitted to retain any of the benefits resulting from the overpayments made by plaintiff and the members of the Damages Class for generic Econazole manufactured by defendants during the Class Period.

117.  Plaintiff and the members of the Damages Class are entitled to the amount of defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.  Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which plaintiff and the members of the Damages Class may make claims on a pro rata basis.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests that the Court enter judgment on plaintiff's behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with plaintiff as the designated Class representative and plaintiff's counsel as Class Counsel;

B.    Defendants have engaged in a combination and conspiracy in violation of §§1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3, and plaintiff and the members of the Class have been injured in their business and property as a result of defendants' violation;

C.    Plaintiff and the members of the Class are entitled to recover damages sustained by them, as provided by the state antitrust laws listed in Count II and the consumer protection laws listed in Count III, to an injunction under federal antitrust laws, and to have a joint and several judgment in favor of plaintiff and the Class entered against defendants in an amount to be trebled in accordance with such laws;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined

and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.     Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.     Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.     Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable by jury.

DATED:  December _20, 2016          SEEGER WEISS LLP
                                   CHRISTOPHER A. SEEGER
                                   DAVID R. BUCHANAN
                                   JENNIFER R. SCULLION (*pro hac vice*
                                   admission to be requested)


                                   _____*/s/ Christopher A. Seeger*_____
                                   CHRISTOPHER A. SEEGER

                                   550 Broad Street, Suite 920
                                   Newark, NJ  07102
                                   Telephone:  973/639-9100
                                   973/639-9393 (fax)
                                   cseeger@seegerweiss.com
                                   dbuchanan@seegerweiss.com
                                   jscullion@seegerweiss.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
ALEXANDRA S. BERNAY
ARTHUR L. SHINGLER III
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
MARK J. DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

BOIES, SCHILLER & FLEXNER LLP
DAMIEN J. MARSHALL
DUANE L. LOFT
MATTHEW S. TRIPOLITSIOTIS
575 Lexington Avenue, 7th Floor
New York, NY  10022
Telephone:  212/446-2300
212/446-2350 (fax)

CAVANAGH & O'HARA
PATRICK J. O'HARA
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)

Attorneys for Plaintiff